An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-140

Filed 3 December 2025

New Hanover County, No. 23JT000125-640

IN THE MATTER OF: D.V.P.

Appeal by respondent-father from order entered 25 October 2024 by Judge J. H. Corpening II in District Court, New Hanover County. Heard in the Court of Appeals 28 October 2025.

> *The Boyette Law Firm, by Geannine M. Boyette, for petitioner-appellee-mother.*
>
> *Sean P. Vitrano for respondent-appellant-father.*

STROUD, Judge.

Respondent-Father appeals from the trial court's order terminating his parental rights in this private action. Because the trial court's findings of fact support its conclusion of willful abandonment under North Carolina General Statute Section 7B-1111(a)(7), we affirm the trial court's order.

## I. Background

Petitioner-Mother and Respondent-Father married in August 2014 and separated in August 2017. During their marriage, the parties had one child together,

Daniel,[1] born August 2016 in Baldwin County, Alabama.

On 7 November 2017, the parties signed a consent agreement settling child custody, child support, and visitation. This agreement was incorporated within the Final Judgment of Divorce entered 14 December 2017 in the Circuit Court of Baldwin County, Alabama. Mother and Father agreed to joint legal custody, with Mother receiving primary physical custody. The court ordered Father to pay $541.00 per month in child support.

Father moved to Michigan in November 2017 to "further his relationship" with Susan Smith,[2] whom he later married in 2019. Father and Ms. Smith have one child together, "J." Ms. Smith also has another child from an earlier relationship, "M."

On 4 September 2018, an Alabama court entered an order finding Father "in arrears for child support in the amount of $3,288.96." This order also modified the parties' "parenting time," as stated in the 14 December 2017 Final Judgment. It awarded Father "three weeks of parenting time" during the month of August 2018 and "parenting time for two consecutive weeks every other month" thereafter. The order also provided that the parent "who does not have physical custody of the minor child is entitled to Facetime or telephonic time with the child . . . on a nightly basis for a period not to exceed thirty minutes."

Mother and Daniel moved to Maryland in July 2019. On 1 June 2020, Father

---

[1] A stipulated pseudonym is used to protect the minor child's identity. N.C. R. App. P. 42.

[2] We use pseudonyms for Father's wife and Mother's husband to protect the minor child's privacy.

was admitted to an inpatient substance abuse treatment program at Henry Ford Maplegrove Center in Michigan and was diagnosed with "Alcohol Use Disorder, Severe." Father was readmitted to various inpatient and outpatient programs at Henry Ford from 2020 to 2022.

On 20 October 2020, the Alabama Circuit Court found Mother in contempt of the 4 September 2018 order for "allow[ing] the minor child to reside in a home with a person under felony indictment, [Bob Hall]." Bob Hall was Mother's boyfriend.[3] The court also ordered Mother not to "withhold visitation from [Father], nor require him to divide his visitation time with the maternal grandmother." Additionally, the order found Father in contempt for "failure to pay child support" and concluded that Mother had "substantially complied with the relocation act."

On 6 May 2021, the Circuit Court for Frederick County, Maryland, domesticated the 14 December 2017, 4 September 2018, and 20 December 2020 Alabama court orders (collectively, Alabama orders). On 8 June 2021, Mother filed a motion in Frederick County to modify child custody, alleging that Father "ha[d] continued to abuse alcohol" and was "not capable of caring for [Daniel] without accommodations or a sober lifestyle." She also asked the court to modify the October 2020 order "restricting [Mother's] ability to have the minor child in the presence or residence of [her] boyfriend" because this restriction was "unduly burdensome" and

---

[3] Despite the Maryland order, and according to Mother's verified petition, she and the child lived with Mr. Hall from December 2017 until August 2019 in Maryland, before moving to North Carolina.

"interfere[ed] with the every day lives of [Mother] and the minor child."

Mother, Mr. Hall, and Daniel moved to New Hanover County, North Carolina, in July 2021.

On 1 December 2021, the Frederick County Circuit Court entered an order granting Mother's 8 June 2021 motion and awarded her sole legal custody of Daniel. The order noted that Father had been "declared in [d]efault" and he did not appear for the hearing. It directed that Father's "access schedule with the Minor Child is hereby be (sic) modified to permit [Father] access with the Minor Child at the discretion of [Mother] allowing access." (Capitalization altered.) Father's child support obligations remained "unaltered and shall continue to be paid upon the terms of the prior [o]rders."

On 12 July 2022, Father moved into Dawn Farm Transitional Housing in Michigan. While there, Father was required to submit to weekly drug screens, attend AA meetings, and perform "at least one hour of community service" per week. On 17 August 2022, Mother sent Father a text message asking him to fill out a form consenting to Daniel changing his surname to Hall, Mother's husband's last name. Father refused; Mother responded that she would "petition the court for abandonment and to have 100% of whatever rights" he had "to be removed" and that she refused "to talk on the phone with [him]." In March 2023, Father tried to call Mother. She responded by text that

> [y]ou have no reason to be calling me. If there's something

you have to say you can text it. Unless it's to sign over your rights, I have nothing to say to you. . . . Please don't call me. If you have anything other than "I'm trying to do the right thing and sign off on [Daniel] having [Bob's] last name" [t]here's literally nothing to talk about.

On 22 August 2023, Mother filed a petition to terminate Father's parental rights in New Hanover County, and on 24 August 2023, she filed an Amended Petition. In the Amended Petition, Mother alleged two grounds to terminate Father's parental rights: (1) he "willfully failed without justification to pay for the care, support, and education" of Daniel under North Carolina General Statute Section 7B-1111(a)(4), and (2) he "willfully abandoned the child for at least six (6) consecutive months next preceding the filing of this petition" under North Carolina General Statute Section 7B-1111(a)(7). Mother initially sought to serve Father by publication, but on 12 January 2024, Father's counsel accepted service on his behalf.

The trial court held hearings on Mother's petition on 2 May and 6 May 2024. In its Termination Order filed 25 October 2024, the trial court rejected Mother's claim that grounds existed to terminate Father's parental rights under Section 7B-1111(a)(4). The trial court, however, concluded that grounds existed under Section 7B-1111(a)(7), in that Father "willfully abandoned" Daniel "for at least six (6) months" before Mother filed the petition. *See* N.C. Gen. Stat. § 7B-1111(a)(7) (2023). The trial court further concluded it was in Daniel's "best interests" to terminate Father's parental rights under Section 7B-1110. *See* N.C. Gen. Stat. § 7B-1110 (2023). Father timely appealed on 29 October 2024.

## II.    Analysis

On appeal, Father argues the trial court erred because "[c]lear, cogent, and convincing evidence did not support the trial court's findings that [he] willfully abandoned Daniel." He also claims that "the trial court erred in concluding that grounds existed to terminate [his] parental rights under [Section] 7B-1111(a)(7)."

A termination of parental rights occurs in two stages. First, "[a]t the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination" under Section 7B-1111(a). *In re B.C.B.*, 374 N.C. 32, 35, 839 S.E.2d 748, 751 (2020) (citation omitted). "We review a trial court's adjudication under [Section] 7B-1111 'to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law.'" *In re E.H.P.*, 372 N.C. 388, 392, 831 S.E.2d 49, 52 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984)). "The trial court's conclusions of law are reviewable de novo on appeal." *In re C.B.C.*, 373 N.C. 16, 19, 832 S.E.2d 692 (2019) (citation omitted).

Following adjudication, "the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental rights." *In re D.L.W.*, 368 N.C. 835, 842, 788 S.E.2d 162, 167 (2016) (citations omitted). This Court "then considers whether the trial court abused its discretion in determining that termination of parental rights was in the best interests of the child." *Id.* (citations omitted).

Here, Father challenges portions of the trial court's findings of fact and its conclusion that he willfully abandoned Daniel under Section 7B-1111(a)(7). Under Section 7B-1111(a)(7), parental rights may be terminated when "[t]he parent has willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of the petition or motion." N.C. Gen. Stat. § 7B-1111(a)(7).

The trial court's Termination Order includes extensive findings of fact about the parties' residence changes, the orders entered in Alabama and Maryland, and the parties' later remarriages and children. And a long series of findings address Father's child support obligation under the Alabama order, his periods of employment and unemployment, and his stints in inpatient treatment for his alcoholism. The trial court found that Father did not pay child support as directed by the Alabama order— but it also found that he was unable to pay the support as ordered—and that his parental rights could not be terminated based on his failure to pay child support under Section 7B-1111(a)(4).

Because the trial court did not terminate Father's parental rights based on his failure to pay child support, we need not address those findings. Father's argument focuses on the trial court's findings concerning willful abandonment under Section 7B-1111(a)(7). We therefore address only those findings.

Mother filed her petition to terminate Father's parental rights on 22 August 2023, so the determinative six-month period for assessing Father's alleged "willful intent to abandon" Daniel runs from 22 February 2023 to 22 August 2023. The

following findings of fact addressed the abandonment claim:

> 48. [Father] did not send [Daniel] any cards, gifts, letters, or any other tokens of affection during the six (6) months next preceding the filing of the Petition herein, or at any other time since he became sober in June of 2022. [Father] has known . . . [Mother]'s address throughout the requisite six-month time period. [Father] has not been incarcerated, admitted to inpatient treatment, or otherwise been limited in his ability to contact [Daniel] or to send cards or letters to [Daniel] during the six (6) months next preceding the filing of the Petition. [Father] has had transportation, has had access to the U.S. Postal Service and has had the ability, financially and physically, to at least purchase a stamp and a card for [Daniel].
>
> 49. [Father] has not sent any (sic) [Daniel] any cards, letters, gifts, or other tokens of affection since the filing of the Petition herein despite his ability to do so as outlined above.
>
> 50. [Father] did not visit [Daniel] during the relevant six-month time frame, nor did he request any visitation during that time. [Father]'s last in-person contact with [Daniel] was in January of 2021 prior to [Father] being admitted to in-patient treatment. [Father] expressed an intent to exercise his summer of 2021 visitation per the Alabama Judgment. [Father] had again relapsed and was abusing alcohol at that time. [Mother] filed her Maryland motion seeking to modify the custodial terms of the Alabama Judgment on June 8, 2021, due to [Father]'s continued alcohol abuse and the visit did not occur. [Father] has not requested any visitation with [Daniel] since June of 2021.
>
> 51. [Father]'s last contact with [Daniel] of any sort was a FaceTime call on or about January 11, 2022. [Mother] had continued to facilitate FaceTime calls between [Father] and [Daniel] so long as [Father] proved his sobriety prior to the call. The parties agreed that [Father] would test his alcohol level on a personal breathalyzer. So long as [Father]'s test results were 0.00, the visit would occur.

[Father] did FaceTime visits intermittently between January of 2021 and January of 2022. [Father] did not contact [Mother] between January 11, 2022, and June 18, 2022.

52. [Father] did not make any meaningful attempt to communicate with [Daniel] during the six months next preceding the filing of the Petition herein, or at any time since his sobriety date in June of 2022. [Father] had access to a phone and had [Mother]'s phone number throughout the relevant six months. [Father] sent . . . [Mother] text messages on a few occasions after his release from inpatient treatment on June 16, 2022. [Father] referenced [Daniel] in some, but not all, of the messages. [Father] did not inquire about [Daniel]'s health and welfare in any of the messages that [Father] sent to [Mother] after he became sober in June of 2022.

53. On June 18, 2022, [Father] sent [Mother] a text message advising her that his criminal charges had been resolved. [Father] did not inquire about [Daniel]'s health or welfare, nor did he request any information regarding [Daniel]. [Father] did not request to speak with [Daniel]. He advised [Mother] to "tell my bubba that I love him."

54. On July 25, 2022, [Father] sent [Mother] a text message regarding his AA sponsor. [Father] did not mention [Daniel].

55. On October 3, 2022, [Father] texted [Mother] a photograph of an AA sobriety chip. In a subsequent message on that same day, [Father] advised [Mother] that he intended to begin calling [Daniel] at 6:00 PM every day. [Father] did not inquire about [Daniel]'s health or welfare or request any information regarding [Daniel]. [Father] did not call [Daniel] at 6:00PM on that night or any night thereafter.

56. [Father] texted [Mother] a photograph of an AA sobriety chip with no other content on December 4, 2022. [Father] texted [Mother] a photograph of an AA sobriety chip on January 1, 2023 and advised [Mother] to "kiss my

sweet boy for me". He did not inquire about [Daniel]'s health or welfare or request any information regarding [Daniel].

57. [Father] texted [Mother] a photograph of an AA sobriety chip with no other content on February 1, 2023; March 1, 2023; April 2, 2023 and May 4, 2023. [Father] did not inquire about [Daniel]'s health and welfare in these messages, nor did he request any information regarding [Daniel]. [Father] did not request contact with [Daniel].

58. [Father] made one request for a FaceTime visit with [Daniel] during the six months next preceding the filing of the Petition in this matter. On August 12, 2023, [Father], who was exercising a daytime visit with [M] and [J], sent [Mother] a text message asking if he and "the girls" could call [Daniel] to wish him "happy birthday." [Daniel] had spoken with [M] and [J] earlier that morning through [Ms. Smith]. [Daniel] and [Father] had not had any contact for more than 1.5 years at that time. [Mother] did not believe that it was in [Daniel]'s best interests for a spontaneous FaceTime call to occur between [Father] and [Daniel] under the circumstances and the call did not occur. [Father] has not requested any further contact with [Daniel] since August 12, 2023.

. . . .

60. **[Father] failed to take any action in the six months next preceding the filing of the Petition herein that evidences a legitimate desire to have a parental relationship with [Daniel]**. While [Father] has occasionally asked [Mother] to show [Daniel] affection on his behalf, such as "tell Bubba that I love him", [Father] has failed to provide [Daniel] with the love, care, and support incident to a parental relationship. [Father] has not shown true interest in [Daniel]'s education, health and welfare. [Father] has not requested health updates on [Daniel]. He has not inquired about [Daniel]'s school or grades. He has not sought information regarding [Daniel]'s interests and activities or [Daniel]'s likes and dislikes. The

Court agrees that a spontaneous FaceTime call between [Daniel and Father] in August of 2023 would not have been in [Daniel]'s best interests.

61. **[Father]'s failure to maintain his relationship with [Daniel] prior to June of 2022 can be partly attributed to [Father]'s alcohol abuse. However, there is no excuse for [Father]'s failure to make a good faith effort to reestablish a relationship with [Daniel] after he became sober.** [Father]'s claim that his lack of relationship with [Daniel] is due to [Mother]'s interference is without merit. His lack of relationship with [Daniel] is because of [Father]'s own inaction, not due to any action on the part of [Mother]. **[Father]'s single request for a FaceTime call with [Daniel] during the relevant six-month time frame does not negate [Father]'s willful failure to perform any parental duties or meet any parental obligations.**

62. . . . [Mother] is married to [Bob Hall], with whom she began a romantic relationship when [Daniel] was approximately 16 months old. Mr. [Hall] has been the most consistent male presence in [Daniel]'s life. Mr. [Hall] is actively involved in providing [Daniel]'s day-to-day care and they share a close and loving relationship. Mr. [Hall] has provided the **care, attention, financial, and emotional support for [Daniel] that [Father], as his biological parent, has willfully failed and refused to provide**. Despite their lack of biological connection, [Daniel] considers Mr. [Hall] to be his father and Mr. [Hall] considers [Daniel] to be his son.

Although Father claims to challenge the bolded portions of these findings, he does not argue that they are unsupported by competent evidence. Findings that are not challenged on appeal are binding on this Court. *In re G.B.*, 377 N.C. 106, 111, 856 S.E.2d 510, 514 (2021) ("All findings of fact which are not challenged by a respondent are binding on appeal." (citations omitted)). Father discusses evidence

- 11 -

about his Alcohol Use Disorder (AUD) and Mother's limitations on allowing him contact with Daniel. And he claims that "[t]he trial court cannot fault [him] for not doing what he was unable to do." But we are bound by the trial court's unchallenged findings of fact, contrary evidence notwithstanding. *See In re L.T.R.*, 181 N.C. App. 376, 381, 639 S.E.2d 122, 125 (2007) ("[F]indings of fact by the trial court in a nonjury trial have the force and effect of a jury verdict and are conclusive on appeal when supported by any competent evidence, even if the evidence could sustain contrary findings." (citation and quotation marks omitted)).

Father's main argument is that the trial court's findings of fact do not support its conclusion of law as to willful abandonment.

> While the question of willful intent is a factual one for the trial court to decide based on the evidence presented, . . . and while the trial court's factual determination is owed deference, it remains our responsibility as the reviewing court to examine whether the evidence in the case supports the trial court's findings and whether, as a legal matter, the trial court's factual findings support its conclusions of law[.]

*In re B.R.L.*, 379 N.C. 15, 18, 863 S.E.2d 763, 767 (2021) (citations omitted).

Father acknowledges that the trial court found that he "became sober" in June 2022—he does not challenge this finding as unsupported by the evidence. Instead, he contends he was in "early remission" at that time and that AUD has a variable

course, with periods of both relapse and remission.[4] He cites *In re D.M.O.*, noting that "the effects of a parent's addiction may be relevant when considering evidence related to willfulness on the issue of abandonment." 250 N.C. App. 570, 576, 794 S.E.2d 858, 863 (2016) (citations omitted). Essentially, he argues that the trial court did not properly consider how his AUD affected his ability to demonstrate care and concern for Daniel during the relevant six-month period.

This case is easily distinguished from *In re D.M.O.*, where the primary impediment to the mother's ability to visit or contact the child was her incarceration, although she also had a history of substance abuse. *Id.* at 577-78, 794 S.E.2d at 864. In *D.M.O.*, this Court noted that the trial court failed to make findings addressing how the mother's incarceration affected her ability to contact and visit her minor child:

> [D]espite finding that [the] respondent-mother had a history of substance abuse and was incarcerated for multiple periods spanning across each of the determinative six months, the court also found that, during those months, [the] respondent-mother failed to exercise visitation and to attend David's sports games, and failed to contact David during three of those months. Yet the court never made findings addressing how [the] respondent-mother's periodic incarceration at multiple jails, addiction issues, or

[4] Father's brief cites information about AUD from the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed.), which was not presented to or considered by the trial court, in violation of Rule 9 of our North Carolina Rules of Appellate Procedure. N.C. R. App. P. 9(a) ("In appeals from the trial division of the General Court of Justice, review is solely upon the record on appeal."). We cannot consider information outside the record. *Hampton v. Scales*, 248 N.C. App. 144, 156, 789 S.E.2d 478, 487 (2016). But the evidence and the trial court's unchallenged findings also show that Father did have periods of alcohol abuse, recovery, relapse, and remission spanning from the time the parties were married to the filing of this petition—nearly a decade.

> participation in a drug treatment program while in custody
> might have affected her opportunities to request and
> exercise visitation, to attend games, or to communicate
> with David. The trial court made no findings establishing
> whether [the] respondent-mother had made any effort, had
> the capacity, or had the ability to acquire the capacity, to
> perform the conduct underlying its conclusion that [the]
> respondent-mother abandoned David willfully. Unlike in
> *D.J.D.*, the trial court here made no findings indicating
> that it considered the limitations of [the] respondent-
> mother's incarceration, or that [the] respondent-mother
> was able but failed to provide contact, love, or affection to
> her child while incarcerated.

*Id.* (citing *In re D.J.D.*, 171 N.C. App. 230, 615 S.E.2d 26 (2005)).

Here, the trial court made extensive findings regarding the course of Father's AUD from the time of the parties' marriage in 2014 up to the time of the hearing, as well as his periods in in-patient treatment. The findings also address his ability to take some action to maintain a relationship or obtain information about Daniel:

> 48. [Father] did not send [Daniel] any cards, gifts, letters,
> or any other tokens of affection during the six (6) months
> next preceding the filing of the Petition herein, or at any
> other time since he became sober in June of 2022. [Father]
> has known . . . [Mother]'s address throughout the requisite
> six-month time period. [Father] has not been incarcerated,
> admitted to inpatient treatment, or otherwise been limited
> in his ability to contact [Daniel] or to send cards or letters
> to [Daniel] during the six (6) months next preceding the
> filing of the Petition. [Father] has had transportation, has
> had access to the U.S. Postal Service and has had the
> ability, financially and physically, to at least purchase a
> stamp and a card for [Daniel].
>
> . . . .
>
> 52. [Father] did not make any meaningful attempt to

communicate with [Daniel] during the six months next preceding the filing of the Petition herein, or at any time since his sobriety date in June of 2022. [Father] had access to a phone and had [Mother]'s phone number throughout the relevant six months. [Father] sent . . . [Mother] text messages on a few occasions after his release from inpatient treatment on June 16, 2022. [Father] referenced [Daniel] in some, but not all, of the messages. [Father] did not inquire about [Daniel]'s health and welfare in any of the messages that [Father] sent to [Mother] after he became sober in June of 2022.

Father also contends that Mother prevented him from having any meaningful contact with Daniel, pointing to evidence that she ignored his messages or requests. In Father's view, Mother demanded that he consent to change Daniel's surname to that of her husband and threatened to terminate his rights if he did not consent.

It is true that Father's visitation and contact with Daniel was in Mother's discretion under the Maryland court order. But the trial court's findings demonstrate that it considered this evidence and found that Mother's actions did not prevent Father from taking some action—even just "purchasing a stamp and a card"—for Daniel during the relevant time. The trial court specifically found, which Father did not challenge on appeal, that "[Father]'s claim that his lack of relationship with [Daniel] is due to [Mother]'s interference is without merit. His lack of relationship with [Daniel] is because of [Father]'s own inaction, not due to any action on the part of [Mother]."

Father also notes that he stopped contacting Mother in October of 2022 except for sending her photos of his chips demonstrating his AA attendance. He testified

that his AA sponsor advised him that his phone calls may seem like "harassment" to Mother and he should "wait until [he] get[s] some sober time" since Mother was not responding to his messages. Although Father's sponsor no doubt had the best of intentions in advising him to stop contacting Mother, the evidence shows that Father had the ability to call Daniel or to send him letters or cards—and he chose not to.

The trial court's findings support its conclusion that Father "willfully abandoned" Daniel "for the six (6) months . . . preceding the filing of the Petition to Terminate Parental Rights" under North Carolina General Statute Section 7B-1111(a)(7).

### III.   Conclusion

The trial court's findings of fact support its conclusion of willful abandonment under Section 7B-1111(a)(7). We therefore affirm the trial court's order terminating Father's parental rights.

AFFIRMED.

Judges ZACHARY and CARPENTER concur.

Report per Rule 30(e).